(Slip Opinion)

# Application of the No TikTok on Government Devices Act to the TikTok USDS Joint Venture

The No TikTok on Government Devices Act, Pub. L. No. 117-328, div. R, 136 Stat. 5258 (2022), prohibits from federal government technology versions of or successors to Tik-Tok that are developed or provided by entities in which ByteDance Limited has a controlling ownership stake.

The version of TikTok operated by the TikTok U.S. Data Security Joint Venture does not fall within this prohibition because the Joint Venture functions independently of ByteDance, is majority-owned by American investors, and has revised the content-recommendation algorithm and cybersecurity program originally developed by ByteDance to insulate federal government information against the concerning security features that initially motivated the prohibition.

July 16, 2026

MEMORANDUM OPINION FOR THE
DEPUTY COUNSEL TO THE PRESIDENT

You have asked us whether officers and employees of the United States may lawfully use TikTok on their government devices now that a "qualified divestiture" will allow the application to continue operating in the United States consistent with the Protecting Americans from Foreign Adversary Controlled Applications Act, Pub. L. No. 118-50, div. H, 138 Stat. 955 (2024). On February 3, 2026, we advised you that TikTok would no longer be banned from federal government technology by the No TikTok on Government Devices Act, Pub. L. No. 117-328, div. R, 136 Stat. 5258 (2022), if facts indicated that, given the qualified divestiture, the risks animating the No TikTok on Government Devices Act were no longer present. On March 10, 2026, we advised that representations contained in a letter sent to you by the General Counsel of the TikTok U.S. Data Security ("USDS") Joint Venture reflect that the version of TikTok now available in the United States poses no such risk. We understand you have since instructed that employees of Executive Branch agencies may download TikTok onto their official devices, subject to the agency's discretion and consistent with all applicable workplace policies. We now memorialize our prior advice.

1

## I.

TikTok is a social media application that, until recently, was wholly "owned and operated by ByteDance Limited, a privately held company headquartered in Beijing, China." Federal Acquisition Regulation: Prohibition on a ByteDance Covered Application, 88 Fed. Reg. 36,430, 36,431 (June 2, 2023). TikTok's relationship with the federal government has been fraught since at least 2020, primarily due to "concerns that China's government controls TikTok's algorithm and could [use it to] access U.S. user data." Ashley S. Deeks & Kristen E. Eichensehr, *Federalism and the New National Security*, 139 Harv. L. Rev. 472, 481–82 (2025). In short, U.S. government officials saw as problematic Americans' use of a platform owned by ByteDance Limited, a Chinese company "subject to Chinese laws that require it to 'assist or cooperate' with the Chinese Government's 'intelligence work' and to ensure that the Chinese Government has 'the power to access and control private data' the company holds." *TikTok Inc. v. Garland*, 145 S. Ct. 57, 63 (2025) (per curiam) (quoting H.R. Rep. No. 118-417, at 4 (2024)); *see also* Exec. Order No. 13942 (2020) ("[T]he spread in the United States of mobile applications developed and owned by companies in [China] continues to threaten the national security, foreign policy, and economy of the United States.").

Although the federal government has "taken repeated actions to address national security concerns regarding the relationship between China and TikTok," *TikTok Inc.*, 145 S. Ct. at 63, just three are at issue here. First among them—both in time and in relevance to your question—is Congress's December 2022 passage of the No TikTok on Government Devices Act (the "Government Ban"). The Government Ban required the Director of the Office of Management and Budget ("OMB"), in consultation with other agency heads, to "develop standards and guidelines for executive agencies requiring the removal . . . from [federal government] information technology" of "the social networking service TikTok or any successor application or service developed or provided by ByteDance Limited or an entity owned by ByteDance Limited." Government Ban § 102(a)(1), (b)(1), 136 Stat. at 5258. The OMB Director promptly did so. *See* Memorandum for the Heads of Executive Departments and Agencies, from Shalanda D. Young, Director, OMB, *Re: "No TikTok on Government Devices" Implementation Guidance* (Feb. 27, 2023) ("OMB Memo").

Two years after enacting the Government Ban, Congress passed the Protecting Americans from Foreign Adversary Controlled Applications Act (the "General Ban"). The General Ban makes it unlawful for *any* entity to provide certain services within the United States to "distribute, maintain, or update" any "foreign adversary controlled application." General Ban § 2(a)(1), 138 Stat. at 955. By statute, that category necessarily includes any application "operated, directly or indirectly," by "ByteDance, Ltd.," "TikTok," or any subsidiary or successor thereof. *Id.* § 2(g)(3), 138 Stat. at 958–59. The General Ban exempts "a foreign adversary controlled application" from its prohibitions, however, if the application undergoes a "qualified divestiture," *id.* § 2(c)(1), 138 Stat. at 956–57—one that the President determines will both (1) result in the application "no longer being controlled by a foreign adversary" and (2) "preclude[] the establishment or maintenance of any operational relationship between the United States operations of the . . . application and any formerly affiliated entities that are controlled by a foreign adversary, including any cooperation with respect to the operation of a content recommendation algorithm or an agreement with respect to data sharing," *id.* § 2(g)(6)(A)–(B), 138 Stat. at 959.

In September 2025, President Trump issued an Executive Order announcing that he had received a plan for a qualified divestiture of TikTok's U.S. operations, which he explained would "allow the millions of Americans who enjoy TikTok every day to continue using it while also protecting national security." Exec. Order No. 14352, § 1 (2025). The President specified that "TikTok's United States application will be operated by a newly established joint venture based in the United States," with ByteDance Limited and its affiliates owning "less than 20 percent of the entity." *Id.* Because the new joint venture would be "majority-owned and controlled by United States persons," as well as "subject to rules that appropriately protect Americans' data and our national security," *id.*, the President found that the General Ban would no longer apply to TikTok following the execution of the proposed deal, *id.* § 2. In January 2026, the divestiture was finalized, and the TikTok USDS Joint Venture was established in the manner contemplated by the President's Executive Order. *See* Memorandum for Gary M. Lawkowski, Deputy Counsel to the President, from AnnaLou Tirol, General Counsel, TikTok USDS Joint Venture, *Re: TikTok USDS JV National Security Safeguards and Protections* at 1–3 (Mar. 6, 2026) ("TikTok Letter").

## II.

To determine whether the application now operated by the TikTok USDS Joint Venture remains statutorily prohibited from federal government devices after the qualified divestiture, we start with the text of the Government Ban. *See Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009). Recall that the ban applies to "the social networking service TikTok or any successor application or service developed or provided by ByteDance Limited or an entity owned by ByteDance Limited." Government Ban § 102(a)(1), 136 Stat. at 5258. We conclude that, as a matter of statutory interpretation, the version of TikTok currently available for download in the United States—which we will call "TikTok USDS" for clarity—does not fall within that prohibited category of applications.

## A.

We first reject the view that TikTok USDS is covered by the Government Ban simply because it looks outwardly identical to, and performs the same social networking functions as, the pre-divestiture TikTok. Congress directed the Government Ban at "*the* social networking service TikTok"—one company within that defined category. *Id.* (emphasis added). Text and common sense counsel that, if an enterprising app-developer created a copycat application mimicking TikTok, agencies would not suddenly be required to "[p]rohibit internet traffic" from their information technology "to [that] application," as the Government Ban would require. OMB Memo at 2. Likewise, if TikTok as we know it went bankrupt and ceased to exist, and a new "social networking service" with the same name emerged in its place, the Government Ban would not cover it based merely on that superficial identity alone. By calling out "the" TikTok, the Government Ban homes in on a specific version of TikTok, rather than reaching broadly for any social media platform so named or so functioning.

Blackletter statutory-interpretation principles illuminate which particular "TikTok" Congress sought to prohibit. It is old wisdom that "a general phrase can be given a more focused meaning by the terms linked to it." *Fischer v. United States*, 144 S. Ct. 2176, 2184 (2024). Namely, "the canon of *noscitur a sociis* teaches that a word is 'given more precise content by the neighboring words with which it is associated.'" *Id.* at

4

2183 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)). We apply this rule to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving 'unintended breadth to the Acts of Congress.'" *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)). And precisely that kind of unexpected breadth would ensue here, were the Government Ban understood to apply to any future social networking platform based on its name alone.

Instead, because "a word is known by the company it keeps," *id.*, the better reading of the Government Ban is that "TikTok" as used in that statute takes its meaning from the other "covered application[s]" to which the ban applies: "any successor application or service developed or provided by ByteDance Limited or an entity owned by ByteDance Limited." Government Ban § 102(a)(1), 136 Stat. at 5258. By "[t]ethering" "TikTok" to that statutory "context," the "focus" of the ban's prohibition becomes clear: It pertains specifically to applications that—like the pre-divestiture TikTok—could facilitate the disclosure of federal government data to ByteDance Limited, and thus potentially to the Chinese government. *Fischer*, 144 S. Ct. at 2180. We therefore conclude that, in banning from federal government devices "the social networking service TikTok," Congress banned only the version of TikTok that shares the same problematic ownership features as the other prohibited applications listed—namely, being "developed or provided by ByteDance Limited or an entity owned by ByteDance Limited." Government Ban § 102(a)(1), 136 Stat. at 5258; *cf. Fischer*, 144 S. Ct. at 2184 ("The examples of prohibited actions all concern dangerous physical conduct that might inflict bodily harm; trash talk is simply not of that kind.").

We have considered the counterargument that, under the Dictionary Act, "words importing the singular include and apply to several . . . things," 1 U.S.C. § 1—thus indicating that the Government Ban's use of the phrase "the social networking service TikTok" *could* denote multiple unrelated variations or iterations of social media companies named TikTok. But the Dictionary Act itself provides that its general prescriptions do not apply when "context indicates otherwise," *id.*, and context does so in this case. "In context[,] the phrase '[the social networking service TikTok]' should not be interpreted to mean literally 'any [social networking service called TikTok],' but must be understood against the back-

ground of what Congress was attempting to accomplish in enacting the [Government Ban]." *Gustafson*, 513 U.S. at 575 (cleaned up) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 63 (1990)). Here, the plain text of the Government Ban indicates Congress was attempting to address a particular national security threat posed by the presence on federal government devices of software "developed or provided by ByteDance Limited or an entity owned by ByteDance Limited." Government Ban § 102(a)(1), 136 Stat. at 5258. TikTok USDS thus is covered by the ban only if it, like the version of TikTok operative when the ban was passed, falls into that category of software.

## B.

Turning to the crux of the question, we conclude that TikTok USDS is not "developed or provided" either by ByteDance Limited itself or by "an entity owned by ByteDance Limited," as would be required to trigger the prohibition of the Government Ban.

### 1.

The first possibility can be dispensed with relatively quickly. TikTok USDS is not "provided" by ByteDance Limited, since the joint venture running the platform "operates as an independent entity, separate from ByteDance." TikTok Letter at 2. On a day-to-day basis, ByteDance Limited is not "supply[ing]" or "mak[ing] available" to American users the services associated with TikTok USDS; instead, the joint venture is. *Merriam-Webster's Collegiate Dictionary* 1001 (11th ed. 2020) (defining "provide"). TikTok USDS also was not "developed" by ByteDance Limited itself, because the joint venture is "retraining, testing, and updating [TikTok USDS's] content recommendation algorithm on U.S. user data." TikTok Letter at 3. Where the joint venture is revising the most critical software component of TikTok USDS, it would not be accurate to attribute the application's current, operative codebase to ByteDance Limited. *See, e.g.*, *Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1190 (2021) (explaining how software developers create applications and programs).

### 2.

Although the second possibility—that TikTok USDS could be "developed or provided by . . . an entity owned by ByteDance Limited," Gov-

ernment Ban § 102(a)(1), 136 Stat. at 5258—warrants further examination, we ultimately reject that possibility too. The key factor here is the joint venture's ownership structure. As discussed, the joint venture "operates as an independent entity, separate from ByteDance": It is "majority-owned by American investors" and governed by a "majority-American board of directors." TikTok Letter at 2. Yet, even after the qualified divestiture, ByteDance still "owns 19.9% of the joint venture." *Id.* at 2 n.1. Whether TikTok USDS falls inside or outside the scope of the Government Ban thus turns on whether "owned" as used in the statute is understood to mean *any* kind of ownership, or only a controlling stake. *See, e.g.*, *Cumulus Invs., LLC v. Hiscox, Inc.*, 520 F. Supp. 3d 1141, 1151 (D. Minn. 2021) (explaining that "to own" can mean both "to 'have or possess as property'" and "to 'have control over'" (citation omitted)); Dean V. Williamson, *Organization, Control and the Single Entity Defense in Antitrust* at 2 & n.2 (Econ. Analysis Grp., Discussion Paper EAG 06-4, 2006) (collecting cases "suggest[ing] that ownership implies control" in the corporate organization context). If the latter, TikTok USDS would pass muster. But if the former, TikTok USDS would remain banned from federal government devices insofar as ByteDance still has some voting power in the joint venture, even if it is insufficient to effect a change in board composition.

For three reasons, we conclude that "ownership" in the context of the Government Ban is best understood as referring to a *controlling* stake, such that TikTok USDS falls outside the prohibition's scope.

*First*, the "control" sense of the word "own" is most "consistent with the way that an appropriately informed speaker of the language would understand [that term's] meaning" in the specific context of corporate structure. *Van Buren v. United States*, 141 S. Ct. 1648, 1657 (2021) (quotation marks omitted). The United States is home to "large numbers of firms with widely dispersed share ownership." Henry Hansmann & Reinier Kraakman, *The End of History for Corporate Law*, 89 Geo. L.J. 439, 443 (2001). But it would be unusual for someone to say that a person or even an institutional investor "owns," for example, Meta, simply because the investor holds some of its stock. *Cf., e.g.*, *Van Buren*, 141 S. Ct. at 1657 ("In the computing context, 'access' references the act of entering a computer 'system itself[.]'"). Instead, in the corporate context, we generally recognize Mark Zuckerberg as the "owner" of Meta because he

retains control of the company through so-called "super-voting" shares. *See* Nathan Reiff, *Top Facebook (Meta) Shareholders*, Investopedia (Mar. 21, 2026), https://perma.cc/XQ6V-ZNTT; Gregory H. Shill, *The Social Costs (and Benefits) of Dual-Class Stock*, 75 Ala. L. Rev. 221, 224 & n.6 (2023).

This semantic distinction tracks American corporate law, which is in many respects grounded in the concept of control. For one significant example, courts often differentiate between minority shareholders—who have limited rights and obligations with respect to the corporation—and shareholders who "exercise control over [the firm's] business decisions"—and therefore owe it various fiduciary duties. *E.g.*, *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994). As a district court put it when answering the question of whether "'owning' a company . . . require[s] owning all of its stock, a majority of stock, or something less than that": "A reasonable person could understand that the largest shareholder of a company . . . owns or controls that company." *Cumulus Invs.*, 520 F. Supp. 3d. at 1151, 1155. Here, then, an English speaker appropriately informed about basic corporate ownership principles would likely say that the TikTok USDS Joint Venture is "owned" by its three managing investors—Silver Lake, Oracle, and MGX—who together hold 45 percent of its shares. *See* TikTok Letter at 2 n.1. Describing ByteDance as the venture's "owner," even if accurate in one technical sense of that word, would not track the intuition that the relevant "owner" is the person or combination of persons controlling the venture.

*Second*, context provided by the later-enacted General Ban further confirms that the corporate-specific definition of "owner" as a "controlling shareholder" applies here. Again, the General Ban prohibits the distribution and hosting within the United States of any application "owned or controlled, directly or indirectly," by ByteDance Limited, *see* General Ban § 2(g)(3)(A)(iv), 138 Stat. at 959, deeming such entity a categorically "foreign adversary controlled application," *id.* § 2(g)(3), 138 Stat. at 958. But the General Ban also provides that "an entity with respect to which a foreign person or combination of foreign persons . . . directly or indirectly own" *less* than "a 20 percent stake" would *not* be "controlled by a foreign adversary" within the meaning of the statute. *Id.* § 2(g)(1)(B), 138 Stat. at 958. The upshot is that the only kind of foreign ownership prohibited by

the General Ban—including ownership by ByteDance—is a 20 percent or greater stake. *See* Exec. Order No. 14352, § 1 (explaining that the TikTok USDS joint venture "will no longer be controlled by any foreign adversary [as defined by the General Ban], since ByteDance Ltd. and its affiliates will own less than 20 percent of the entity").

"[S]tatutes addressing the same subject matter generally should be read 'as if they were one law.'" *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) (quoting *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972)). It would be counterintuitive to conclude that "ownership" means a controlling stake in the context of the General Ban, but *any* kind of ownership in the context of the Government Ban—where both statutes regulate essentially the same entities and were designed to address essentially the same problem. *See* Deeks & Eichensehr, *supra*, at 481–82. Instead, we think it more likely that Congress intended both bans to target the same kind of corporate structure, which is also what we commonly understand as corporate "ownership": the ability to exercise control. Indeed, the General Ban subsumed the Government Ban, as it is difficult to download onto a U.S. government device an application that cannot be hosted on any native U.S. data interface in the first place.

*Third*, reading "ownership" in the Government Ban to mean "controlling ownership" also comports with the overarching purpose of the statute: to prevent disclosure of sensitive American data, including federal government data, to the Chinese government. *See* S. Rep. No. 117-256, at 2 (2022). A controlling shareholder likely has the kind of ownership stake that would risk such disclosures because the shareholder could direct the implementation of policies to facilitate that result. By contrast, a non-controlling shareholder that lacks the power to make corporate governance decisions would not be able to unwind *anti*-disclosure policies put in place by the Board majority. *See, e.g.*, *Kahn*, 638 A.2d at 1114 (explaining that non-controlling shareholders lack "actual control of corporation conduct" (quoting *Citron v. Fairchild Camera & Instrument Corp.*, 569 A.2d 53, 70 (Del. 1989))). There would thus be no reason for Congress to target that kind of minority stake for adverse treatment—in either the General or the Government Ban. *See Adoptive Couple v. Baby Girl*, 570 U.S. 637, 649 (2013) (interpreting statute in the light of "the primary mischief [it] was designed to counteract").

One counterargument against the foregoing analysis is that Congress intended to impose a more stringent standard to determine when applications affiliated with ByteDance Limited must be banned from federal government devices, as compared to when they must be banned from internet hosting services more generally. A proponent of this view could contend that the fact the Government Ban lacks the qualified-divestiture exception contained in the General Ban supports—rather than contravenes—the conclusion that any up-the-chain, minority ownership by ByteDance Limited is sufficient to trigger the Government Ban's prohibitions, since Congress knew how to exempt such ownership and chose not to. We acknowledge that, in isolation, a comparison between the two statutes could point in either direction. But in the light of the ordinary meaning of "ownership" in the corporate context, as well as the clear anti-disclosure policy underpinning both the Government Ban and the General Ban, we think the bans are better understood as converging rather than diverging. The ultimate target of both statutes is "foreign adversary *controlled* application[s]." General Ban § 2(g)(3), 138 Stat. at 958 (emphasis added). Because TikTok USDS no longer satisfies that standard based on the best interpretation of the term "ownership" in the Government Ban, the Government Ban is best understood not to reach it.

## III.

Our textual interpretation is confirmed by the facts on the ground, which indicate that the TikTok USDS joint venture is wholly controlled by American interests as a functional as well as a formal matter—and thus exhibits none of the concerning security features that initially motivated the Government Ban. As our prior advice to you highlighted, if facts did not bear out that conclusion, then our understanding of "ownership" as used in the Government Ban could be called into question. But where, as here, the facts demonstrate that ByteDance Limited's status as a minority shareholder in the joint venture has no impact on the exercise of control over the venture by United States investors, the inference runs the opposite way. Congress had no need to target minority ownership by ByteDance Limited in the Government Ban because that state of affairs is wholly compatible with the joint venture "operat[ing] [TikTok USDS] under defined safeguards that protect national security." TikTok Letter at 3.

As TikTok USDS's General Counsel has informed you, the "joint venture has control over sensitive U.S. user data [contained within TikTok USDS], and protects such data within Oracle's secure U.S. cloud environment." *Id.* "[E]xternal ByteDance systems and personnel (along with all other unauthorized personnel) are prohibited from directly accessing or retrieving data from the secured U.S. environment." *Id.* The joint venture also retains U.S. third-party cybersecurity experts to "audit[] and certif[y]" its "privacy and cybersecurity program" for TikTok USDS, as well as to "proactively identify and disclose [any] vulnerabilities" in TikTok USDS's codebase. *Id.* at 3–4. These safeguards would appear to make TikTok USDS just as data-secure as any other social networking service, if not more so. Given all these constraints on data-sharing outside of the Oracle cloud system, TikTok USDS will insulate federal government information against leaks to ByteDance Limited or affiliated Chinese government entities. The fact that ByteDance Limited remains a minority shareholder in the joint venture operating TikTok USDS makes no practical difference.

## IV.

The text, context, and purpose of the No TikTok on Government Devices Act confirm that it is best read as prohibiting only applications developed or provided by entities in which ByteDance has a controlling ownership stake. The facts provided to you by TikTok USDS demonstrate that ByteDance Limited does not have such a problematic stake: ByteDance Limited is a minority shareholder in the joint venture and lacks voting power to alter the robust security protocols that the joint venture has established for TikTok USDS. As a result, TikTok USDS no longer possesses the concerning ownership features that Congress determined allowed a foreign adversary the ability to target federal government information. Thus, we conclude that TikTok USDS is not banned from federal government devices by the No TikTok on Government Devices Act.

Of course, this conclusion only confers on agencies the discretion to permit employees to use TikTok USDS on their government devices; there is no mandate that agencies exercise that discretion in any particular way in any or all cases. For instance, agencies may independently decide

to ban the downloading of TikTok to government devices for workforce management reasons, such as promoting employee productivity. Our opinion should not be understood to call those administrative decisions into question.

Please let us know if you have any additional questions.

T. ELLIOT GAISER
*Assistant Attorney General*
*Office of Legal Counsel*